FORSTER *v.* GREEN.

MASTER AND SERVANT—EXTRA SERVICES—ESTOPPEL.

An employé of a widow is estopped to claim compensation from the trustees of the estate of her deceased husband for services in watching property belonging in part to the widow and in part to the estate, where it is apparent that the joint agent of the widow and of the estate, who directed him to watch the property, supposed that such duty came within his employment, and the employé did nothing to indicate that he expected extra compensation therefor, and for two years gave monthly receipts importing payment by the widow "in full" for services to date.

Error to Wayne; Aldrich, J., presiding. Submitted October 20, 1896. Decided December 24, 1896.

*Assumpsit* by Andrew Forster against William S. Green and another, trustees of the estate of William B. Wesson, deceased, for work and labor performed. From a judgment for plaintiff, defendants bring error. Reversed.

*Julian G. Dickinson*, for appellants.

*William Look* and *Ira G. Humphrey* (*Edward Minock*, of counsel), for appellee.

MONTGOMERY, J. Defendants are trustees of the estate of William B. Wesson. Defendant Green also acts as

agent for Mrs. Wesson, paying her bills, and taking receipts therefor, and accounting to her. Defendant Green employs one John Brinket, who was a former employé of Mr. Wesson in his lifetime, and who still continues to look after Mrs. Wesson's affairs to some extent. In the spring of 1891, plaintiff was employed to work for Mrs. Wesson. Mr. Brinket did the business for Mrs. Wesson, and testifies that the hiring was under instructions from Mrs. Wesson, and that he did not confer with defendants at all about hiring plaintiff. Witness Brinket, who was called for the plaintiff, also testified that he had no general authority to employ workmen in behalf of the defendants, and that he never hired any men except under special instructions from Mr. Green. According to the plaintiff's testimony, after he had been employed some time, he was told by Mr. Brinket to go up and watch a grove on Baldwin avenue. This grove belonged in part to the Wesson estate, and in part to Mrs. Wesson. Plaintiff proceeded to follow this instruction, and, as he testified, visited this grove four or five times a week from March, 1892, to September, 1894, and this action is brought to recover for these services; plaintiff claiming that the direction to go and look after this grove amounted to an independent hiring on behalf of the defendant estate. During all this time, at the end of each month, plaintiff was paid his $40 per month, and signed receipts, both before and after March, 1892, reading, in substance, as follows: "Received of Lacyra E. Wesson, forty dollars, in full for services to date." These payments and receipts continued down to the time that plaintiff ceased work.

Plaintiff's own testimony as to the instructions given him to look after this grove is as follows:

"On the first day of March, 1892, Mr. Brinket gave me the order to see to that bush,—so much timber was cut up.

"Q. How long did you work watching before you were called to look to the grove?

"*A.* From the 14th of May, 1891, to the 1st of March, 1892.

"*Q.* It was then you were ordered to look after the grove?

"*A.* Yes, sir. I looked after the grove two years and a half. There was no bargain made as to how much I was to receive for watching the grove.

"*Q.* You said there was no bargain?

"*A.* No bargain."

On cross-examination, witness testified:

"Mr. Brinket was my boss. That was my first experience with Mr. Brinket. I haven't ever been in his employ there before. He hired me. Whenever there was an order he gave me the order.

"*Q.* You have stated how he hired you?

"*A.* Yes, sir.

"*Q.* He sent you to Mrs. Seyburn?

"*A.* Yes, sir.

"*Q.* And Mrs. Seyburn told you to go to work?

"*A.* Yes, sir; and I continued to watch inside the fence. I had nothing to do outside the fence. Mr. Brinket gave me an order to see after the bush. I didn't have any orders to go outside of the fence.

"*Q.* Did you have any orders to do anything while you were there?

"*A.* Yes, sir; Mr. Brinket gave me an order to sprinkle the street. * * * I knew Mr. Brinket was my boss; that he bossed me afterwards once. I was not acquainted with his business before that, except that I knew that he was employed at the Wessons'. That is all that I knew. * * *

"*Q.* Why didn't you demand pay for taking care of the grove before?

"*A.* I was keeping my family up with them $40 I have for night work. I thought I would let that stand. Whenever I wanted it, I would call for it.

"*By a Juror:* When you were asked by Brinket to do this extra work, was there anything said about your getting additional pay?

"*A.* No; not a word.

"*Q.* Didn't you say to him, at the time, that you expected to get additional pay?

"*A.* I expected it.

"*Q*. Did you say that to him?
"*A*. I told him a couple of times.
"*Q*. At the time you were engaged by him?
"*A*. No."

On redirect examination, he was asked when he told Mr. Brinket that he expected pay for the additional work, and answered that he didn't know the exact time.

"*Q*. What did he say about it?
"*A*. Oh, nothing."

The circuit judge left it to the jury to find—*First*, whether Brinket had authority to make the contract; and, *second*, whether there was an agreement that the estate should pay plaintiff such amount as such work was reasonably worth. We think the circuit judge erred in submitting the case to the jury upon the evidence offered. It is clear that these orders were given upon the assumption that the work demanded of plaintiff fell within his employment, and there was not the slightest indication by the plaintiff, at the only time any contract is alleged to have been made, from which Brinket or the defendants could draw the inference that he had any other understanding. And when the fact is taken into account that for nearly two years thereafter he signed a receipt in full for his services at the end of each month, the rank injustice of permitting him to assert a secret intention to make an additional charge for his services is plainly manifest. The case falls directly within the principle of *Bartlett* v. *Railway Co.*, 82 Mich. 658.

The judgment will be reversed, with costs, and no new trial ordered.

The other Justices concurred.